## Commonwealth *vs.* Ernesto Gonzalez.

Essex. February 7, 2012. - June 13, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Parental Kidnapping. Constitutional Law,* Equal protection of laws. *Practice, Criminal,* Indictment, Dismissal. *Grand Jury.*

A Superior Court judge erred in granting the criminal defendant's motion to dismiss an indictment charging him with parental kidnapping, where the Commonwealth presented to the grand jury evidence that the defendant had relinquished care of his child within the meaning of G. L. c. 209C, § 10 (*c*), and thereby that the defendant lacked lawful authority in allegedly taking the child [463-466]; further, there was no merit to the defendant's claim that the parental kidnapping statute, G. L. c. 209C, § 10 (*b*), was unconstitutional as applied to him, where the defendant did not pursue a remedy to obtain sole or shared physical custody of the child in the Probate and Family Court, where the defendant had acquiesced to the arrangement regarding physical custody that he now challenges, and where the defendant had not shown that he would have been denied custody [466-469].

Indictments found and returned in the Superior Court Department on December 10, 2008.

A motion to dismiss was heard by *John T. Lu,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

*Russell Sobelman* for the defendant.

Lenk, J. The defendant was indicted in December, 2008, pursuant to G. L. c. 265, § 26A (parental kidnapping statute), after his five year old nonmarital son,[1] whom we shall call G.G., disappeared while in the defendant's care.[2] Relying on

---

[1] See *Smith* v. *McDonald,* 458 Mass. 540, 544 n.6 (2010), citing *Woodward* v. *Commissioner of Social Sec.,* 435 Mass. 536, 543 n.12 (2002).

[2] The defendant was indicted also for misleading a police officer in connection with a criminal investigation, G. L. c. 268, § 13B (1) (*c*) (iii); that charge is not part of this appeal.

*Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982), the defendant filed a motion to dismiss the indictment (*McCarthy* motion). The thrust of the defendant's argument was that the Commonwealth could not prove, as it must under the parental kidnapping statute, that he acted "without lawful authority" in allegedly taking G.G. To the extent the Commonwealth relied on G. L. c. 209C, § 10 (*b*),[3] to satisfy this element of the crime, the defendant argued that the operation of that statute in these circumstances gave rise to an unconstitutional violation of his right to equal protection because it discriminated against him on the basis of his gender. See art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution.[4] A Superior Court judge allowed the defendant's *McCarthy* motion on the basis of the unconstitutionality of G. L. c. 209C, § 10 (*b*), as applied, and we granted the parties' joint application for direct appellate review.

Because the indictment may properly rest on the application of another, gender-neutral statute, G. L. c. 209C, § 10 (*c*), and because, in these circumstances, the defendant cannot raise an as-applied constitutional challenge to G. L. c. 209C, § 10 (*b*), in a *McCarthy* motion, we reverse the order allowing the motion to dismiss the indictment.

1. *Background.* The evidence presented to the grand jury was as follows.[5] On May 1, 2003, G.G. was born to D.C., his mother, and the defendant. D.C. and the defendant were never married. The defendant is listed as G.G.'s father on his birth certificate.[6]

---

[3] General Laws c. 209C, § 10 (*b*), provides: "Prior to or in the absence of an adjudication or voluntary acknowledgment of paternity, the mother shall have custody of a child born out of wedlock. In the absence of an order or judgment of a [P]robate and [F]amily [C]ourt relative to custody, the mother shall continue to have custody of a child after an adjudication of paternity or voluntary acknowledgment of parentage."

[4] "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

[5] Although we consider the facts in the light most favorable to the Commonwealth, see *Commonwealth* v. *Caracciola*, 409 Mass. 648, 649 n.1 (1991), these facts are generally undisputed. In his brief, the defendant adopted the Commonwealth's statement of facts.

[6] Although the existence of the defendant's name on G.G.'s birth certificate was not before the grand jury, this fact does not affect the outcome of our decision. D.C. testified before the grand jury that the defendant was G.G.'s father.

The family lived together until G.G. was "close to two" years old. After D.C. and the defendant separated in 2005, G.G. remained in the care of D.C., and the defendant orally agreed to pay $125 per week in child support, which accounted for half of the cost of G.G.'s daycare. Three weeks after making this agreement, the defendant unilaterally reduced the amount to thirty dollars per week. After the reduction, D.C. sought an order for child support in the Probate and Family Court. In approximately April, 2007, when G.G. was almost four years old, the defendant acknowledged paternity[7] and a Probate and Family Court judge ordered that $125 per week be withdrawn from his paycheck. The defendant did not then seek, nor did the judge issue, any orders regarding custody or visitation.

More than one year later, in June, 2008, the defendant filed a complaint in the Probate and Family Court for joint custody of G.G. and for visitation rights. At that time, the defendant had not had contact with G.G. for almost one year.[8] The defendant and D.C. also had conversations in which the defendant indicated his desire to reenter G.G.'s life, and, after the defendant met D.C. and G.G. at a restaurant on July 27, 2008, D.C. agreed that the defendant would have weekend visits with G.G. at the defendant's home in Lynn. The first two such visits (August 1-3 and August 8-10, 2008) took place without incident.

On Sunday, August 17, 2008, however, G.G. went missing. Like the previous two weekends, G.G. was scheduled to spend the weekend with the defendant; according to D.C., he had been dropped off at the defendant's home on Friday, August 15, 2008, at about 4 p.m. When D.C. arrived at the defendant's home on Sunday afternoon to pick up G.G., no one came to the door or answered the telephone. After four hours of trying to get in touch with the defendant, D.C. contacted the Lynn police.

---

[7]According to the motion judge, the term "acknowledgment" of paternity was used "colloquially" rather than legally, i.e., the defendant stated that he was G.G.'s father without executing a legal acknowledgment of that status. See G. L. c. 209C, § 11 (setting forth requirements for legal acknowledgment of paternity). We assume that there was in fact a "voluntary acknowledgment of parentage" for the purposes of G. L. c. 209C, § 10 (*b*), because the Commonwealth stated at oral argument that paternity had been "formally" acknowledged.

[8]According to defense counsel, during that one-year period the defendant "basically ha[d] disappeared" from G.G.'s life.

Eventually, fire fighters were able to enter the defendant's apartment through an open second-floor window. They found the defendant locked inside another room of the apartment. G.G. has not since been found. Although several witnesses testified to the contrary before the grand jury,[9] the defendant told police that he had not been with G.G. that weekend, and had not seen him since his visit the previous weekend.

The defendant was indicted and charged with parental kidnapping. Pursuant to G. L. c. 265, § 26A, the Commonwealth was required to prove that the defendant, "without lawful authority," held G.G. permanently or for a protracted period of time, or took G.G. from his lawful custodian. To prove the absence of the defendant's lawful authority, the Commonwealth relied on G. L. c. 209C, § 10 (*b*). That statute sets forth a default rule for custody of nonmarital children, requiring that, "[i]n the absence of an order or judgment of a [P]robate and [F]amily [C]ourt relative to custody, the mother shall continue to have custody of a child after an adjudication of paternity or voluntary acknowledgment of parentage."

In his *McCarthy* motion, the defendant argued that, as G.G.'s "biological father," he was automatically a custodial parent, at least absent a court order divesting him of custody. The Commonwealth argued in response that G. L. c. 209C, § 10 (*b*), granting ongoing custody of nonmarital children to their mothers absent modification by court order, established the defendant's lack of lawful authority and was thus sufficient to support the indictment. The defendant countered that, as applied to him, G. L. c. 209C, § 10 (*b*), operated as an unconstitutional denial of his right to equal protection, pursuant to art. 1, because it discriminated against the defendant on the basis of his gender. A

[9]A receptionist at the Lynn Community Health Center testified that she saw the defendant there on Saturday, August 16, 2008, with "a little boy . . . about five years old." The receptionist said it was the same boy shown in the missing person flyer depicting G.G. A therapist at the same health center testified that the defendant had brought his son, G.G., with him to an appointment that day. Another individual, who knew the defendant from work, also testified that he saw the defendant with G.G. at the health center that Saturday. Two neighbors testified that they saw the defendant with G.G. outside of his apartment on the same day. There was also evidence that two dinosaur toys that D.C. said G.G. had brought with him to the defendant's apartment that Friday were found in the apartment after G.G. disappeared.

Superior Court judge agreed and, after a hearing, allowed the defendant's motion to dismiss. We granted a joint application for direct appellate review.

2. *Discussion.* Pursuant to *McCarthy, supra* at 163, "at the very least the grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him" (citations omitted). While ordinarily courts do not "inquire into the competency or sufficiency of the evidence before the grand jury," *Commonwealth* v. *Robinson*, 373 Mass. 591, 592 (1977), quoting *Commonwealth* v. *Galvin*, 323 Mass. 205, 211-212 (1948), *McCarthy* allows a court to dismiss an indictment where the grand jury receive "*no* evidence of criminality" on the part of the accused. *Commonwealth* v. *Caracciola*, 409 Mass. 648, 650 (1991). "[A] requirement of sufficient evidence to [indict] is considerably less exacting than a requirement of sufficient evidence to warrant a guilty finding." *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984), citing *Myers* v. *Commonwealth*, 363 Mass. 843, 848-849 (1973). With these principles in mind, we turn to an assessment of the defendant's *McCarthy* motion.

The crime of parental kidnapping requires that an individual, "being a relative of a child less than eighteen years old, *without lawful authority*, holds or intends to hold such a child permanently or for a protracted period, or takes or entices such a child from his lawful custodian" (emphasis supplied). G. L. c. 265, § 26A. "The grand jury must be presented with evidence on each of the . . . elements, but the defendant here challenges only the evidence concerning the element of" lawful authority.[10] *Commonwealth* v. *Moran*, 453 Mass. 880, 884 (2009). Therefore, the Commonwealth must have put forward some evidence before the grand jury to establish "probable cause," *Commonwealth* v. *O'Dell, supra*, to believe that the defendant, in taking or holding G.G., acted "without lawful authority."

In the context of a parental kidnapping charge, the Commonwealth can prove that an individual lacks lawful authority over his child in a number of ways — by operation of a range

---

[10]The defendant has not disputed the sufficiency of the evidence presented to the grand jury with respect to any other element of the crime charged.

of statutes or by court order.[11] Where an element of a crime can be proved "in any one of several ways," and "an indictment properly charges its commission in all those ways," the defendant "should be convicted if it is proved that he committed the crime in any of those ways." *Commonwealth* v. *Dowe*, 315 Mass. 217, 219-220 (1943). See *Commonwealth* v. *Cheremond*, 461 Mass. 397, 405 (2012) (holding that indictment for murder in the first degree "charges murder by whatever means it may have been committed, regardless of the theory of murder presented to the grand jury"). Because he has been charged with parental kidnapping, the defendant can be convicted if the Commonwealth can establish his lack of lawful authority over G.G. in any way in which that element can be proved.

For this element, the Commonwealth relies on the application of G. L. c. 209C, § 10 (*b*). "The statute governing nonmarital children, G. L. c. 209C, establishes a comprehensive scheme for determining paternity and for establishing child support, visitation, and custody rights for children born outside of a marriage." *Smith* v. *McDonald*, 458 Mass. 540, 544 (2010). As part of this comprehensive scheme, under G. L. c. 209C, § 10 (*b*), "the child's mother is vested with sole physical and legal custody, and that custody arrangement continues even after paternity is established until modified by a court."[12] *Smith* v. *McDonald*, *supra* at 545. The defendant raises an as-applied constitutional

---

[11]We reject the defendant's argument that *Commonwealth* v. *Beals*, 405 Mass. 550, 556 (1989), establishes that parents can never be charged under the parental kidnapping statute in the absence of a court order. That case addressed only the situation of marital parents; because the parents were married when their children were born, they were presumed to have "equal rights to custody." See G. L. c. 208, § 31 ("In making an order or judgment relative to the custody of children, the rights of the parents shall, in the absence of misconduct, be held to be equal, and the happiness and welfare of the children shall determine their custody"). The decision did not construe G. L. c. 209C, which comprehensively addresses the situation of nonmarital parents.

[12]We have construed this statute as not applying to give sole custody of nonmarital children to their mothers where the father acts as a custodial parent. See *Department of Revenue* v. *C.M.J.*, 432 Mass. 69, 77 (2000). In that case, the father and mother of the nonmarital children were "both sharing a household and together raising and supporting the children." *Id.* at 80. In such circumstances, we held that, even without a court order granting the father custody, the statute could not be construed as rendering him a noncustodial parent because "the statutory provision does not state that an adjudicated father shall *not* have custody in the absence of such an order or judgment."

challenge to the operation of that statute, claiming that it unlawfully discriminates against him on the basis of his gender.

"[W]e generally decline to reach constitutional questions where . . . there is a readily available statutory ground that renders such a decision unnecessary." *Commonwealth* v. *Vega*, 449 Mass. 227, 234 (2007). As a result, if the evidence presented to the grand jury is sufficient to satisfy the Commonwealth's burden to present "any evidence," *Commonwealth* v. *O'Dell*, *supra* at 450, that the defendant lacked lawful authority over G.G. on a basis other than the operation of G. L. c. 209C, § 10 (*b*), we need not consider the defendant's constitutional challenge to that statute.

We conclude that the defendant's indictment permissibly may rest on a different statutory ground. General Laws c. 209C, § 10 (*c*), which provides that "[i]f either parent . . . relinquishes care of the child or abandons the child and the other parent is fit to have custody, that parent shall be entitled to custody," properly vests custody in D.C., G.G.'s mother. The defendant had a three-year custodial absence from G.G.'s life, including a one-year complete "disappear[ance]," in the words of defense counsel. During this period, D.C. acted as G.G.'s sole custodian.[13] When the defendant did try to reenter G.G.'s life, he first sought out D.C.'s permission, in apparent recognition of her role as G.G.'s custodial parent.

This evidence is sufficient for the Commonwealth to meet its

*Id.* at 77. Accordingly, the Probate and Family Court judge was without authority to order the father to pay child support. To hold otherwise, we noted, "would raise potential constitutional problems." *Id.*

This holding, however, does not apply to the instant case. The defendant had not provided comparably consistent care and support for G.G. and, most obviously, had not been living with G.G. for some time. Indeed, except for the two previous weekends, he had not even seen G.G. for about one year at the time of G.G.'s disappearance.

[13]According to the testimony of an investigating officer before the grand jury, $125 per week was withdrawn from the defendant's paycheck for child support pursuant to court order. The mandated support payments, beginning two years after the defendant and D.C. separated and G.G. remained with his mother, leave unaffected our conclusion that the Commonwealth put forward sufficient evidence before the grand jury that the defendant "relinquishe[d] care" of G.G. to D.C. See G. L. c. 209C, § 10 (*c*). The custodial arrangement between the defendant and D.C. remained the same both before and after the payments were ordered.

burden to put forth "any evidence," *Commonwealth* v. *O'Dell,* *supra,* that the defendant had "relinquishe[d] care" of G.G. to D.C., G. L. c. 209C, § 10 (*c*), and thereby that the defendant lacked lawful authority, as required for a parental kidnapping charge, upon the expiration of D.C.'s permission at the end of the weekend visit.[14]

In any event, we would be loath to permit a defendant to raise an as-applied constitutional challenge to G. L. c. 209C, § 10 (*b*), in the circumstances presented by this case. The defendant did not pursue his remedy to obtain sole or shared physical custody of G.G. in the Probate and Family Court. Instead, according to the grand jury testimony, he allegedly took G.G., to the exclusion of his custodial parent, and now asserts his custodial rights in a kidnapping prosecution. The proper avenue of redress would have been to file for physical custody of G.G. in the Probate and Family Court pursuant to G. L. c. 209C, §§ 1 and 10, and there challenge the default rule in favor of D.C.'s custody. If a Probate and Family Court judge, after consideration of the defendant's petition pursuant to the standards set forth in G. L. c. 209C, § 10 (*a*), refused to enter an order granting the defendant either joint or sole physical and legal custody, the defendant could then have pressed his challenge on appeal. See *Fathers & Families, Inc.* v. *Chief Justice for Admin. & Mgt. of the Trial Court,* 460 Mass. 508, 510 (2011); *Blixt* v. *Blixt,* 437 Mass. 649 (2002), cert. denied, 537 U.S. 1189 (2003). In light of its expertise, the Probate and Family Court is particularly well suited to hear such a claim in the first instance. See *Glick* v. *Greenleaf,* 383 Mass. 290, 293-294 (1981).

To hold otherwise would allow unmarried noncustodial fathers simply to take their children, without judicial process, and to the exclusion of custodial mothers, and air their grievances with the application of the statutes governing nonmarital children in the subsequent criminal prosecution for parental kidnapping.

[14]As we held in *Department of Revenue* v. *C.M.J., supra,* G. L. c. 209C, § 10 (*b*), does not deprive custodial fathers of their right to custody of their nonmarital children. Thus, where a mother of a nonmarital child relinquishes care of the child to the father, G. L. c. 209C, § 10 (*c*), properly vests custody in the father notwithstanding G. L. c. 209C, § 10 (*b*). Because G. L. c. 209C, § 10 (*c*), by its operation and terms, is gender neutral, it comports with equal protection principles.

We have generally sought to encourage resolution of disputes in court and discourage resort to such "self-help." See *Commonwealth* v. *Moreira*, 388 Mass. 596, 600 (1983) (defendant may not use force to resist unlawful arrest, absent excessive force by arresting officer, as there are "legal processes available to restore his liberty" and thus "self-help by an arrestee has become anachronistic").

Ensuring that individuals do not resort to self-help is particularly important in these circumstances, to protect the safety of nonmarital children who are the subject of custody disputes. Resort to self-help in custody disputes "is an irresponsible . . . remedy. Not only does self-help make the eventual placement of the children an arbitrary consequence but it breeds reprisal in kind . . . ." *Nelson* v. *Nelson*, 433 So. 2d 1015, 1018-1019 (Fla. Dist. Ct. App. 1983), quoting *Application of Lang*, 9 A.D. 2d 401, 408 (N.Y. 1959). In adjudicating custody disputes over nonmarital children, courts utilize the "best interests of the child" analysis. *Smith* v. *McDonald*, 458 Mass. 540, 545 (2010), quoting G. L. c. 209C, § 10 (*a*). Undoubtedly, a touchstone of this inquiry is the child's safety. See *Blixt* v. *Blixt, supra* at 658 (best interests inquiry relates to child's "health, safety, or welfare"). Allowing unmarried, noncustodial fathers to take a child first and raise as-applied challenges to the constitutionality of the custody statutes later would place the child's safety at risk and thus contravene the child's best interests. Whatever right nonmarital, noncustodial fathers have to custody "will not be enforced to the detriment of the child." *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932).[15] In this context, our policy is to discourage self-help and encourage resort to the Probate and Family Court for resolution of disputes over child custody.

An as-applied constitutional challenge is particularly inappro-

---

[15]Whatever parental interest the defendant claims does not compel a contrary result, as we previously explained that a parent's interest in his relationship with his child is not absolute, because the "overriding principle" in determining the right of a parent to custody "must be the best interest of the child." *Opinion of the Justices*, 427 Mass. 1201, 1203 (1998), quoting C.C. v. A.B., 406 Mass. 679, 691 (1990). "[T]he first and paramount duty of courts is to consult the welfare of the child. To that governing principle every other public and private consideration must yield." *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932).

priate in this case because the defendant had acquiesced to the arrangement regarding physical custody that he now challenges. General Laws c. 209C, § 11 (*b*), specifically contemplates that parents of nonmarital children may "make agreements regarding custody," and provides that courts shall approve those agreements absent a finding that they are not in the child's best interests.[16] The defendant and D.C. had apparently reached such an agreement regarding physical custody following their separation in 2005, and this did not change even in 2008, when the defendant sought in the Probate and Family Court shared legal custody and regular visitation. This arrangement did not confer upon him any lawful authority over G.G. at the end of the August 15-17, 2008, weekend. Any indication of his future intention to seek physical custody was foreclosed by his filing in the Probate and Family Court, where he sought only joint legal custody and visitation rights.[17] Indeed, had the defendant received what he sought in the Probate and Family Court — legal custody — he still would not have had lawful authority to take G.G. beyond the time permitted by D.C. on the day in question, except as to any court-ordered visitation. The defendant's filing for legal, rather than physical, custody is indicative of his intention to relinquish the right to custody that he now purports to raise.

[16]Agreements between parents in the upbringing of their children are generally favored. See G. L. c. 208, § 31 ("Where the [divorcing] parents have reached an agreement providing for the custody of the children, the court may enter an order in accordance with such agreement, unless specific findings are made by the court indicating that such an order would not be in the best interests of the children"); *Custody of Zia*, 50 Mass. App. Ct. 237, 248 n.16 (2000) ("It goes without saying that we encourage parental agreement in the sensitive area of child custody when it is possible and in the best interests of the child").

[17]The defendant's particular filing — for joint *legal* custody — was not before the grand jury. The investigating officer testified before the grand jury only that the defendant filed "for visitation and or joint custody." The ambiguity of this testimony means that the grand jurors were unaware that the defendant had sought only "involvement . . . in major decisions regarding the child's welfare," G. L. c. 208, § 31, and not a right to shared physical custody of G.G. Because we consider this filing only as to the propriety of the defendant's as-applied constitutional challenge, and not in our assessment of the sufficiency of the evidence before the grand jury, we may take judicial notice of the defendant's application for joint legal custody. "As to . . . related proceedings, a court may also take judicial notice of the records of other courts." *Jarosz* v. *Palmer*, 436 Mass. 526, 530 (2002), quoting P.J. Liacos, Massachusetts Evidence § 2.8.1, at 26 (7th ed. 1999).

This conclusion is consistent also with our opinion in *Commonwealth* v. *Powell*, 459 Mass. 572 (2011), cert. denied, 132 S. Ct. 1739 (2012). In *Powell*, we held that a defendant could not bring an as-applied constitutional challenge to his convictions under the firearm licensing statute — which makes it unlawful to carry a firearm without a license or firearm identification card — where he never attempted to obtain a license, and thus could not demonstrate "that a denial of the issuance of [a license] would have been rendered." *Id.* at 589. The defendant in that case "chose instead . . . to violate the law," *id.* at 590, and carry a firearm without the proper licensing. We have applied this principle repeatedly in subsequent cases. See *Commonwealth* v. *Johnson*, 461 Mass. 44, 58-59 (2011); *Commonwealth* v. *Loadholt*, 460 Mass. 723, 725 (2011). To raise a proper as-applied constitutional challenge, the defendant, like the defendants challenging the firearm licensing statute in *Powell* and its progeny, must show that he would have been denied custody before he can challenge the constitutionality of the custody statutes as applied to him. Having not pursued fully his remedy in the Probate and Family Court, or demonstrated any interest in physical custody of G.G. in the three years before his disappearance, the defendant cannot now raise such a constitutional challenge.

3. *Conclusion.* The order allowing the defendant's motion to dismiss the indictment is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*