EDWARD J. STINSON *vs.* WILLIAM F. MEEGAN & another.

Middlesex.     May 8, 1945. — June 29, 1945.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & WILKINS, JJ.

*Parent and Child. Personal Liberty. Minor. Probate Court,* Personal liberty, Proceedings after rescript. *Words,* "Unfit."

Sections 35–40 of G. L. (Ter. Ed.) c. 248 are adapted for use by a person entitled to custody of a minor child to secure his release from the custody of another who has no legal right to control of his person, even though the child is merely living with the respondent under his protection, care, and control and is not otherwise technically imprisoned.

A Probate Court, hearing a petition under §§ 35–40 of G. L. (Ter. Ed.) c. 248 by one, alleging himself to be entitled to custody of a minor child, to secure his release from the custody of one who has no legal right to control of his person, is not absolutely bound to take the child from the existing custody, even if the petitioner has the technical right to custody, but may exercise its judicial judgment not to interfere with the existing situation when reasons of paramount importance demand that course; and it would hardly be a reasonable exercise of judicial power to grant such a petition when the circumstances are such that the child would immediately be restored to the same custody upon a petition for guardianship under G. L. (Ter. Ed.) c. 201. Per QUA, J.

The question to be decided upon a petition by a parent under G. L. (Ter. Ed.) c. 248, §§ 35–40, for the release of his minor child from the

custody of another is substantially the same as it would be upon a petition by the respondent for guardianship of the child with custody under c. 201.

A finding, by a judge of probate who heard a petition under G. L. (Ter. Ed.) c. 248, §§ 35–40, by a father seeking release of his five and one half year old daughter from the custody of her uncle and aunt with whom she had lived practically since birth, that "the petitioner abandoned the child," if interpreted to mean that the petitioner had been guilty of the crime defined by G. L. (Ter. Ed.) c. 119, § 12, as amended, would not have been warranted by the evidence, and was construed by this court as intended to be consistent with more specific findings and as meaning that the petitioner did not seek possession of the child when he could have done so, but permitted her to remain with the respondents until they had come to love her as their own child and had expressed a desire to adopt her without change of name, when he brought the petition.

Evidence at the hearing of a petition in a Probate Court under G. L. (Ter. Ed.) c. 248, §§ 35–40, by a father seeking release of his daughter, five and one half years of age, from the custody of an uncle and aunt with whom he had placed her shortly after her birth and the death of her mother, and with whom she had remained, showed the petitioner to be of good reputation and financially able to support the child and would not have warranted a finding that his home was not a proper one in which to bring her up, and therefore required a reversal of a decree dismissing the petition, although the petitioner had had practically no contact with the child, was a stranger to her, had not contributed to her support and, about a year after her birth, had remarried and had then been in a position to take her into his home, but had not sought to do so until the respondents expressed a desire to adopt her without change of name.

Upon the reversal of a decree of a Probate Court dismissing a petition by a father under G. L. (Ter. Ed.) c. 248, §§ 35–40, seeking release of his daughter, five and one half years of age, from the custody of an uncle and aunt, this court stated that because more than two years had passed after the hearing in the Probate Court before the case was decided in this court, the decree after rescript, without the commencement of new proceedings by any party, might be adapted to decisive changes in conditions, if any, found to have occurred after the hearing in the Probate Court.

PETITION, filed in the Probate Court for the county of Middlesex on March 24, 1943.

The case was heard by *Leggat*, J.

*W. J. Barry*, for the petitioner.

*P. P. O'Connor*, for the respondents.

QUA, J.    This petition is brought under G. L. (Ter. Ed.) c. 248, §§ 35–40, to secure the release of the petitioner's minor child, Mary F. Stinson, born October 3, 1937, from

the custody of the respondents, who are husband and wife, the wife being the maternal aunt of the child. Mary's mother died when Mary was born. The Probate Court dismissed the petition, and the petitioner appeals.

The sections of the General Laws referred to above were originally enacted as St. 1894, c. 536, under the title, "An Act relative to personal liberty." They are now incorporated without change of substance at the end of a chapter entitled "Habeas Corpus and Personal Liberty" under the subheading "Personal Liberty." They provide an alternative method by which relief can be had by petition, hearing, and decree in the Probate Court without the more cumbersome proceeding of issuing a writ of habeas corpus, which, when issued, can be made returnable only to the Supreme Judicial Court or a justice thereof, before which court or justice the alleged prisoner must be produced at the time of the return and the hearing must be had. G. L. (Ter. Ed.) c. 248, §§ 2, 4, 10, 11, 12, 15. See now also G. L. (Ter. Ed.) c. 213, § 1A, as inserted by St. 1939, c. 257, § 1, and amended.

Provisions of the statute material in the present case may be summarized as follows: Section 35 reads, "No person shall be deprived of his liberty or held in custody by any person or in any place against his will or, if he is a minor, against the will of his parents, guardian or other person entitled to his custody, except by due process of law . . . [not to apply to persons serving sentence for crime]." Section 36 provides that whoever has reason to believe that another person is deprived of his liberty or held in custody in violation of the preceding section may file the petition. The remaining sections contain provisions for notice to the supposed custodian (§ 37), for examining him and other witnesses, and for the making of orders for the release of the person held in custody or for permitting correspondence or personal interviews between him and his friends or relatives and for modification of the court's orders upon notice to the parties (§ 38).

We think this statute is adapted for use, just as the writ of habeas corpus itself might be used, by the person entitled

to custody of a minor child to secure his release from the custody of another who has no legal right to the control of the person of the child, even though the child is merely living with the respondent under his protection, care, and control and is not otherwise technically imprisoned. See *Curtis* v. *Curtis*, 5 Gray, 535; *Dumain* v. *Gwynne*, 10 Allen, 270; *Stone* v. *Duffy*, 219 Mass. 178. We also think that in cases of this kind when brought under this statute as well as when a habeas corpus is employed the court is not absolutely bound to take the child from the existing custody, even though the petitioner is found to have the technical right, and that the court may exercise its judicial judgment not to interfere with the existing situation when reasons of paramount importance demand that course. See *Commonwealth* v. *Hammond*, 10 Pick. 274; *Commonwealth* v. *Briggs*, 16 Pick. 203, 205; *Woodworth* v. *Spring*, 4 Allen, 321, 325–326; *Dumain* v. *Gwynne*, 10 Allen, 270, 275; *Stone* v. *Duffy*, 219 Mass. 178, 182–183. It would hardly be a reasonable exercise of judicial power to allow a proceeding under this statute to be used to take a young child from a custodian with whom he was happy and well cared for, when the circumstances were such that he would be immediately restored to the same custody upon a petition for guardianship under G. L. (Ter. Ed.) c. 201. We do not believe that the sections of c. 248 here involved should be construed so technically and rigidly as to require that result. The provisions of § 38 seem to imply some degree of flexibility in the court's action. From this view of the statute it follows that, although the general right of custody of his minor child remained in the petitioning father as the surviving parent, and it is plain that the respondents hold Mary in their custody against the will of her father, yet he is not entitled to prevail under the statute if the circumstances are such that legal custody ought now to be given to the respondents. The question actually to be decided in this case is therefore much the same as it would have been if the respondents had petitioned for appointment as guardians of Mary with custody of her person. Such custody would be granted as against the claim of the surviving

parent only if he were found "unfit to have such custody," G. L. (Ter. Ed.) c. 201, § 5; *Commonwealth* v. *Briggs*, 16 Pick. 203, 205, but it is settled that the meaning of "unfit" is not confined to the moral character or personal qualities of the parent, and that it embraces other circumstances of the particular case bearing upon the necessity of interfering with parental control, particularly such circumstances as involve the welfare of the child himself. *Richards* v. *Forrest*, 278 Mass. 547.

The evidence is reported and is conflicting upon material points. However, the following facts may be deemed established either by findings of the judge supported by evidence or by evidence not seriously disputed. The petitioner is "an engineer" and is employed "in the Navy Yard." At the time of the hearing he was forty-four years of age. About a year after his wife's death he married again and now lives in a six room apartment in that part of Boston known as Dorchester with his second wife and four children, of whom two, a whole brother and whole sister of Mary, are children of the first marriage and two, a half brother and half sister of Mary, are children of the second marriage. The petitioner appears to be a man of good reputation and to be financially able to support his child. For about a month after her birth Mary was in a Waltham hospital. After that, the petitioner, having no place to take her, voluntarily brought her to the respondents' residence in Stoneham. The respondents took her in and kept her, cared for her and supported her, and were still doing so at the time of the hearing, a period of about five and one half years. The petitioner made no financial arrangement with the respondents to pay for her support. During the whole period he gave them $38, paid by way of gratuity and not at the respondents' demand. He visited Mary twice in 1938 and not at all in 1939. He saw her twice in 1940, once by accident, not at all in 1941, and twice in 1942. He gave her a $25 war bond at Christmas, 1942. "During all this time . . . he never asked for the child's return nor gave any indication that he ever expected her to be returned to him." Her older brother and sister have visited Mary "two or

three times and have seen her on but two or three other occasions." "Mrs. Meegan has cared for the child as a mother and she has known no other." "Her father and his present wife and his children are strangers to her." Just before this petition was brought Meegan wrote to the petitioner stating that he was supporting Mary without being able to claim any deduction for her support in his income tax return; that he and Mrs. Meegan loved Mary as their own child; that he intended to adopt her without change of name; and that she would learn to know her true father, brother, and sister. He asked for a full reply. Then for the first time the petitioner, through his counsel, demanded the custody of Mary. He was in a position to take Mary into his home when he remarried about a year after Mary's birth, but "did not see fit" to do so. "The respondents have expended considerable sums of money upon . . . [Mary] and have become attached to the child, and the child has formed associations that cannot be severed without injury to it." At the time of the hearing Mrs. Meegan was fifty-four years of age. Meegan is a carpenter by trade. He also is employed by the navy. The Meegans live in a six room cottage with about two acres of land. They have three boys much older than Mary, one of whom is in military service. The Meegan home is "a proper one in which to bring up the child." Meegan is financially able to support her. Although the judge made no express finding as to whether the petitioner's home is "a proper one in which to bring up the child," the evidence does not support a finding that it is not a proper one.

The judge made a further finding on all the evidence that "the petitioner abandoned the child." We do not construe this finding as intended to mean that the petitioner was guilty of the crime of abandonment defined in G. L. (Ter. Ed.) c. 119, § 12, as amended. We think the evidence would not support a finding to that effect. We construe the finding as intended to be consistent with the more specific findings and as meaning that the petitioner did not seek the possession of his child when he could have done so, but

that he permitted her to remain with the respondents until the present situation resulted.

This case must be governed by principles fully developed in the leading case of *Richards* v. *Forrest*, 278 Mass. 547, and followed in the very recent case of *Gordon* v. *Gordon*, 317 Mass. 471. Both cases presented facts closely parallel to those in the present case. In both cases the parents placed their child while very young in the care and custody of her uncle and aunt and allowed her to remain there, supported at their expense, for a period of years until affection sprang up between the child and her custodians, and the latter came to occupy the position toward the child ordinarily occupied by the true parents, so that custody of the true parents could not be restored without a distressing and harmful experience. Yet it was held more important in the long view that the child should be reared with her own next of kin and in companionship with her own brothers and sisters. It is unnecessary to repeat the reasoning fully set forth in those cases. Careful comparison of the facts upon which the *Richards* case was decided with those upon which the present case must be decided fails to reveal any differences in favor of the present respondents which can fairly be deemed determinative. It is true that in that case it was stated that "Apparently the child is not a stranger to her parents," while in the present case it is found that the petitioner and his wife are "strangers" to the child. But in the *Gordon* case it was likewise found that the child had had only "casual contacts" with her parents. It is also true that in both the *Richards* case and the *Gordon* case the true mother was living, and there was no stepmother with children of her own. In some cases this might become a circumstance of consequence, but there is nothing to show that it is so here. It does not appear that the petitioner's wife treats his children any differently from her own or that she has not fully assumed the position of a mother toward all of the children in the family. There was some evidence that when first married she stated that she did not wish to take over the care of Mary when she took over the care of the older children, but this was denied,

and the judge made no finding of its truth. She testified that she could take care of Mary as well as of the other children and that she wanted Mary "home."

In the *Richards* case it was said that great weight must be given to the decision of the probate judge, and that the case was very close (278 Mass. at page 556). Nevertheless, in the absence of some more than nominal or irrelevant distinction we feel bound to follow the *Richards* and *Gordon* cases. See *Bottoms* v. *Carlz*, 310 Mass. 29.

This case appears to have been heard in the Probate Court in the spring of 1943. It was argued here in May, 1945. More than two years will have elapsed after the hearing in the Probate Court and before the rescript upon this decision is handed down. If decisive changes in the governing circumstances have occurred in that period, the decree after rescript may be adapted to existing conditions without the commencement of new proceedings by any party. See *Gray* v. *Parke*, 155 Mass. 433, 438; *Day* v. *Mills*, 213 Mass. 585.

*Decree reversed.*